# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **15 CR 611-3** |
| | ) | |
| **v.** | ) | **Judge John Z. Lee** |
| | ) | |
| **JOEL ROSARIO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

In February 2016, Defendant Joel Rosario was charged with interstate transportation of stolen property and possession of a firearm in violation of federal law. During the investigation leading to these charges, the Government obtained historical cell-site location information (CSLI) for Rosario's cell phone from his service provider. Rosario has moved to suppress the CSLI, contending that the Government violated his Fourth Amendment rights by procuring it without first obtaining a warrant. For the reasons that follow, the Court holds that the Government's acquisition of CSLI from Rosario's service provider was not a search in violation of the Fourth Amendment. Rosario's motion to suppress is therefore denied.

## Background

On or around December 5, 2013, a store in Ann Arbor, Michigan, was burglarized after it closed for the day. Gov't's Resp. Def.'s Mot. Suppress at 1, ECF No. 95. The store specialized in the sale of firearms, rare coins, and precious

metals. *Id.* Twenty-four firearms, as well as various collector coins and other property, were stolen from the premises. *Id.*

According to the store's owner, three men entered the store to look at firearms about forty-five minutes before closing time on December 5. *Id.* The next morning, the owner discovered that the store had been burglarized overnight. *Id.* at 2. The owner also determined that, after the store had closed for the day on December 5, it had received a phone call from a private caller. *Id.* The owner passed this information to law enforcement officers, who in turn contacted Comcast, the store's telephone service provider, to request the private caller's phone number. *Id.* Comcast accommodated this request and provided the phone number to the officers. *Id.*

Using open-source records, officers determined that Sprint was the service provider for the cell phone corresponding to the number Comcast had provided. *Id.* The officers contacted Sprint to request CSLI[1] for the cell phone, and Sprint provided the requested information. *Id.* The CSLI revealed that the phone had "pinged" off of various cell towers in Illinois on December 3 and 4. Def.'s Mot. Suppress at 2, ECF No. 81. It also revealed that the phone had pinged off of a tower in Lansing, Michigan, at 9:26 p.m. on December 4 and a tower in Ann Arbor,

---

[1]     CSLI identifies cell phone towers "to and from which a cell phone has sent or received radio signals, and the particular points in time at which these transmissions occurred." *United States v. Graham*, 796 F.3d 332, 343 (4th Cir. 2015), *vacated on other grounds*, 824 F.3d 421 (4th Cir. 2016). A cell phone sends and receives signals from the tower "with which it shares the strongest signal, which is typically the nearest cell [tower]." *Id.*; *see also United States v. Rogers*, 71 F. Supp. 3d 745, 748 (N.D. Ill. 2014) (describing how cell phones communicate with cell towers).

Michigan, at 11:14 p.m. later that same night.  *Id.*  Finally, the CSLI showed that, from 11:14 p.m. on December 4 to 6:37 p.m. on December 5, all of the pings from the cell phone came from towers in the Ann Arbor area.  *Id.*

In addition to requesting the CSLI, officers attempted to determine the owner of the cell phone that was associated with the number Comcast had provided.  *See* Resp. at 2 n.1.  After surveying hotels in the Ann Arbor area, officers learned that the phone number had been provided to a Comfort Inn under Rosario's name.  *Id.*

On February 24, 2016, Rosario was indicted with one count of interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and one count of possession of a firearm in violation of 18 U.S.C. § 922(g) in connection with the robbery that took place in Ann Arbor.  *Id.* at 3.  The Government disclosed the CSLI to defense counsel during discovery, Mot. Suppress at 2, and Rosario now argues that the CSLI was improperly used as a basis for his arrest and prosecution.  Reply at 2, ECF No. 112.

## Analysis

Rosario has moved to suppress the CSLI that the Government requested from Sprint.  He argues that the Government requested the CSLI in violation of his Fourth Amendment rights by failing to first obtain a warrant supported by probable cause authorizing the CSLI's acquisition.  *See id.* at 1–2.[2]

---

[2]     Rosario also argues that the CSLI should be suppressed because the Government obtained it without a court order pursuant to the Stored Communications Act (SCA), 18 U.S.C. § 2701 *et seq.*  Reply at 2.  Under the SCA, a court may issue an order requiring an electronic-communications service provider to disclose certain subscriber information where the Government "offers specific and articulable facts showing that there are reasonable grounds to believe" that the information sought is "relevant and material to an ongoing

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects[ ] against unreasonable searches and seizures." U.S. Const. amend. IV. A "search" falling within the ambit of the Fourth Amendment occurs "when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001); *accord United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006).

The Seventh Circuit has not addressed whether the Government's acquisition of CSLI from a third-party service provider violates a reasonable expectation of privacy so as to constitute a search under the Fourth Amendment. *See United States v. Daniels*, 803 F.3d 335, 351 (7th Cir. 2015) (expressly declining to decide this question); *United States v. Thousand*, 558 F. App'x 666, 670 (7th Cir. 2014) (same). So far, however, every federal court of appeals to confront this issue has held that the acquisition of CSLI from a third-party service provider is not a Fourth Amendment search. *United States v. Graham*, 824 F.3d 421, 424–25 (4th Cir. 2016) (en banc), *petition for cert. filed* (Sept. 26, 2016) (No. 16-6308); *United States v. Carpenter*, 819 F.3d 880, 886–90 (6th Cir. 2016), *petition for cert. filed* (Sept. 26, 2016) (No. 16-402); *United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015) (en banc), *cert. denied*, 136 S. Ct. 479 (2015); *In re Application of the U.S. for Historical*

---

criminal investigation." 18 U.S.C. § 2703(d); *accord United States v. Daniels*, 803 F.3d 335, 351 (7th Cir. 2015). A person aggrieved by a violation of the SCA may seek remedies in a civil action. 18 U.S.C. § 2707(b). No remedies are available for SCA violations apart from those specifically provided in the statute, and the SCA does not include suppression of evidence as an available remedy. *Id.* §§ 2707–08. As such, the Government's failure to obtain a court order under the SCA before requesting the CSLI from Sprint is not a basis for granting Rosario's motion. *See Huon v. Mudge*, 597 F. App'x 868, 875 (7th Cir. 2015).

*Cell Site Data*, 724 F.3d 600, 608–15 (5th Cir. 2013). Districts courts within the Seventh Circuit to consider this issue have likewise concluded that the acquisition of CSLI is not a Fourth Amendment search. *United States v. Adkinson*, No. 4:15-CR-25, 2017 WL 1318420, at *5 (S.D. Ind. Apr. 7, 2017); *United States v. Wheeler*, 169 F. Supp. 3d 896, 910 (E.D. Wis. 2016); *United States v. Lang*, 78 F. Supp. 3d 830, 836 (N.D. Ill. 2015); *Rogers*, 71 F. Supp. 3d at 750; *United States v. Benford*, No. 2:09-CR-86, 2010 WL 1266507, at *3 (N.D. Ind. Mar. 26, 2010).

In holding that the acquisition of CSLI from a service provider is not a Fourth Amendment search, courts have relied on the third-party doctrine. Under the third-party doctrine, an individual does not have a reasonable expectation of privacy in information that he voluntarily turns over to a third party, and the Government therefore does not engage in a Fourth Amendment search when it acquires such information. *Smith v. Maryland*, 442 U.S. 735, 743 (1979); *United States v. Miller*, 425 U.S. 435, 442 (1976). The reason for this rule is that an individual "takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." *Miller*, 425 U.S. at 443. The third-party doctrine applies to information provided to a third party "even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Id.*

Among the Supreme Court precedents expounding the third-party doctrine, *Smith v. Maryland* brings the most to bear on the present case. In *Smith*, the Court

considered whether the Government's use of a pen register[3] to record the numbers dialed on a home telephone constituted a search under the Fourth Amendment. 442 U.S. at 736. The Court applied the third-party doctrine to hold that such use of a pen register is not a Fourth Amendment search. *Id.* at 743–46. In so holding, the Court explained that, "[w]hen he used his phone, petitioner voluntarily conveyed numerical information [*i.e.*, the phone numbers he dialed] to the telephone company and 'exposed' that information to its equipment in the ordinary course of business." *Id.* at 744. Thus, the petitioner could "claim no legitimate expectation of privacy" in the numbers that he dialed. *Id.*

In light of *Smith*, this Court concludes that a cell phone user voluntarily conveys CSLI to his third-party service provider when he operates his cell phone, and that the Government's acquisition of CSLI therefore is not a Fourth Amendment search. First, *Smith* was based in part on the common-sense recognition that "[a]ll telephone users realize that they must 'convey' phone numbers to the telephone company . . . [and] that the phone company has facilities for making permanent records of the numbers they dial." *Id.* at 742. Likewise, in this day and age, cell phone users are aware that a cell phone must send and receive wireless signals to and from a nearby cell tower in order to transmit phone calls and text messages. "When an individual purchases a cell phone and chooses a service provider, he expects the provider will, at a minimum, route outgoing and

---

[3]     "A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." *Smith*, 442 U.S. at 736 n.1 (internal quotation marks omitted).

incoming calls and text messages. As most cell phone users know all too well, proximity to a cell tower is necessary to complete these tasks." *Graham*, 824 F.3d at 430; *accord Carpenter*, 819 F.3d at 888 ("[A]ny cellphone user who has seen her phone's signal strength fluctuate must know that, when she places or receives a call, her phone 'exposes' its location to the nearest cell tower and thus to the company that operates the tower."); *In re Application*, 724 F.3d at 612 ("A cell service subscriber . . . understands that his cell phone must send a signal to a nearby cell tower in order to wirelessly connect his call.").

In addition, the decision to purchase a phone, select a service provider, turn on the phone, and make a call or send a message involves voluntary acts at every step. *See Graham*, 824 F.3d at 430; *In re Application*, 724 F.3d at 613–14. Because a cell phone user knows that his phone sends signals to a nearby cell tower whenever he operates it, the user voluntarily conveys those signals to his service provider when he chooses to make a call or send a message, as well as when he leaves the phone on so that it can receive incoming calls and messages. *See Graham*, 824 F.3d at 430; *Carpenter*, 819 F.3d at 888; *see also Davis*, 785 F.3d at 520 (Pryor, J., concurring) ("If a cell phone user does not want to reveal his location to a cellular carrier, he [ ] has another option: turn off the cell phone."). In other words, when the user operates his phone, he voluntarily conveys CSLI to his service provider, which records the CSLI based on the signals transmitted to its cell towers. In this regard, cell phone users are similar to the telephone users considered in *Smith*, who "voluntarily conveyed" phone numbers to service providers that in turn

kept records of those numbers "in the ordinary course of business." *Smith*, 442 U.S. at 744; *see also Graham*, 824 F.3d at 430–31 (comparing the transmission of CSLI to the transmission of phone numbers at issue in *Smith*).

The Court acknowledges that numerous jurists and commentators have raised some serious questions as to the application of the third-party doctrine to CSLI. For example, dissenting judges in the Fourth and Eleventh Circuits have posited that a cell phone user does not voluntarily convey CSLI, because he is unaware of the CSLI at the moment it is conveyed and because CSLI is generated automatically by his service provider's network instead of by the cell phone user himself. *See Graham*, 824 F.3d at 444–46 (Wynn, J., dissenting in part); *Davis*, 785 F.3d at 534 (Martin, J., dissenting). Litigants and commentators have further argued that the acts of purchasing and operating a cell phone do not amount to voluntary conveyance of CSLI, given the practical necessity of cell phone use in modern life. *See, e.g.*, *Graham*, 824 F.3d at 432–33 (acknowledging defendants' argument that individuals "must risk producing CSLI or 'opt out of modern society'"); Lauren E. Babst, Note, *No More Shortcuts: Protect Cell Site Location Data with a Warrant Requirement*, 21 Mich. Telecomm. & Tech. L. Rev. 363, 390–92 (2015) (internal quotation marks omitted) ("It is truly fiction that the vast majority of the American population, by choosing to carry cell phones in a world that practically demands it, also consents to warrantless government access to their location information.").

These arguments, however, are immaterial to the application of the third-party doctrine under current Supreme Court precedent.[4] "[T]he Supreme Court's use of the word 'voluntarily' in *Smith* . . . does not require contemporaneous recognition of every detail an individual conveys to a third party." *Graham*, 824 F.3d at 430. Nor does the third-party doctrine turn on whether the information at issue is generated by an automated third-party system, rather than by an individual himself. *See Smith*, 442 U.S. at 744–45 ("We are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate."). And the majority of the Court in *Smith* was unpersuaded by the dissenting justices' argument that, "unless a person is prepared to forgo use of what for many has become a personal or professional necessity, he cannot help but accept the risk of surveillance." *Id.* at 750 (Marshall, J., dissenting).

Furthermore, although the Seventh Circuit has not considered whether the third-party doctrine applies to CSLI, it recently applied the doctrine to similar circumstances in *United States v. Caira*, 833 F.3d 803 (7th Cir. 2016), *petition for cert. filed* (Sept. 11, 2016) (No. 16-6761). In *Caira*, the Seventh Circuit considered whether a Fourth Amendment search occurs when the Government obtains

---

[4]     There is, of course, reason to think that current Supreme Court precedent might not remain current for long. At least one of the justices has suggested that the third-party doctrine is due for an overhaul. *See United States v. Jones*, 565 U.S. 400, 417 (2012) (Sotomayor, J., concurring) ("[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. . . . This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks."); *see also Graham*, 824 F.3d at 437 (suggesting that the Supreme Court might soon revisit the third-party doctrine). But unless and until the Supreme Court revisits the third-party doctrine to suit the challenges of the digital age, lower courts remain bound to apply the doctrine in the manner that is most faithful to existing precedent.

subscriber information associated with an individual's Internet protocol (IP) address[5] from a third-party technology company. *Id.* at 806. The court applied the third-party doctrine to answer this question in the negative. *Id.* at 807. It reasoned that the defendant had voluntarily sent his IP address to a third-party technology company (namely, to Microsoft, the owner of the defendant's web-based e-mail service) every time he logged in to his e-mail account. *Id.* Because the defendant "voluntarily shared his I.P. addresses with Microsoft, he had no reasonable expectation of privacy in those addresses." *Id.* at 809.

The IP addresses at issue in *Caira* are closely analogous to the CSLI at issue in the present case. An individual's voluntary acts—accessing the Internet and operating a cell phone—trigger the conveyance of both IP addresses and CSLI, respectively, to third parties. As with CSLI, the precise details of a computer's IP address are not necessarily known to the end user at the time he accesses the Internet. Moreover, IP addresses and CSLI are both automatically generated by technological equipment, rather than by an individual himself, upon the individual's use of the Internet or a cell phone. Finally, like cell phones, the Internet has become a pervasive—indeed, indispensable—feature of modern American life. For these reasons, it follows that if an individual "voluntarily" conveys his IP address by accessing the Internet, *see Caira*, 833 F.3d at 807–09, then an individual "voluntarily" conveys his CSLI when he operates his cell phone,

---

[5] An IP address is a unique ten-digit number that is used to identify a computer when the computer attempts to locate and connect to websites on the Internet. *See Black's Law Dictionary* (West 10th ed. 2014); *Nat'l Cable & Telecomm'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 987 n.1 (2005).

such that the third-party doctrine takes the Government's acquisition of CSLI outside the Fourth Amendment's scope.

Rosario submits that the Supreme Court's decision in *Riley v. California*, 134 S. Ct. 2473 (2014), compels a different result. But this argument is misplaced. In *Riley*, the Court held that the Government may not engage in a warrantless search of digital information on a cell phone found on an arrestee's person. *Id.* at 2485. The Court reasoned that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects" that might be found during a search incident to arrest. *Id.* at 2489. More specifically, the Court characterized cell phones as implicating heightened privacy interests in light of the large quantity of information they can store and the sensitive, personal nature of that information. *Id.* at 2489–91. *Riley*, however, focused exclusively on the doctrine governing searches incident to arrest; it made no mention of the third-party doctrine. Because *Riley* involved a "distinct doctrinal area[ ]," it does not control whether the Government may acquire CSLI from a third-party service provider. *United States v. Guerrero*, 768 F.3d 351, 359 (5th Cir. 2014) (distinguishing *Riley* on this basis); *accord Davis*, 785 F.3d at 516 n.19 (same); *see also Carpenter*, 819 F.3d at 889 (distinguishing the "internal" cell phone data at issue in *Riley* from CSLI).

In sum, Rosario voluntarily conveyed his CSLI to Sprint when he operated his cell phone. As such, under the third-party doctrine, Rosario did not have a reasonable expectation of privacy in Sprint's records of his CSLI. The Government's acquisition of the CSLI from Sprint therefore was not a search implicating Rosario's

Fourth Amendment rights, and Rosario has not offered a basis for excluding the CSLI from evidence.

## Conclusion

For the reasons stated herein, Rosario's motion to suppress [81] is denied.


**IT IS SO ORDERED.**              **ENTERED   5/16/17**

_____
**John Z. Lee**
**United States District Judge**